Mr. Fleming, Mr. Lynch, and Mr. Tietze. Thank you, your honors. May it please the court, counsel. This is kind of an unusual and in some respects a fascinating case through everything that went on, and the record, the common law record is extremely lengthy, but there are just several specific issues that we've raised on appeal, and a couple I'd like to specifically speak to on oral argument on behalf of the husband, Mr. Bauman. First one deals with the question of reimbursement to the marriage for mortgage payments that were made on a farm loan, and this was regarding property that Mr. Bauman had purchased initially before the marriage with a $200,000 loan, and then payments were made on that loan during the course of the marriage. The court ended up ordering that Mr. Bauman reimburse the marital estate almost $400,000 in payments made over the years. Considering that, in essence, a contribution to the non-marital estate that should be reimbursed, and as we pointed out in our brief, first of all, we believe that's a mistake, and actually, although I treated this as a matter of abuse of discretion, that in essence it's an error of law under the Snow case of this court, which holds that when reimbursement is being considered for payment of loans, that interest is not to be part of the reimbursement. The court found that there was the $200,000 loan, and there was about a $100,000 balance owing at the time of the divorce, so therefore, of the $378,000 in payments, and that was simply figured out by taking the annual loan payment that was made times the number of years, about $278,000 of that was interest. The $100,000 principal reduction was effectively handled by the court, because at some point real estate was sold, some of the farmland was sold, and netted about $100,000, which was put into the family account, and the court properly recognized that as reimbursement. So that credit was given by the trial court, but the rest of it, which is essentially all the interest, was ordered reimbursed. Counsel, on page 27 of your brief, you say the land generated enough income to cover the mortgage payments. Yes. Did the court make that finding? I'm pretty sure your client testified to that. Yes, that's true. Or was it disputed? I don't think it was disputed, Your Honor, and the court, I know, made several references throughout its lengthy opinion to the fact that the farming operations and then the road repair business, which Mr. Baumann also ran, generated virtually all of the income for the parties during the marriage, and there wasn't any, I don't think there was any clear-cut breakdown of how much money the farming operation made, or specifically how much money was made from these parcels, but I don't believe there was any contesting my client's representation or statement that those farms did generate enough to pay. The non-marital farms, those are the ones I'm talking about. Right. So the non-marital farm ground, then, is it your position made enough money to pay those mortgage payments in the 29 years? Not only the mortgage payments, but there was additional money made that was then put back into the marital account and used for day-to-day expenses for the family. Well, if that argument was made to the trial court, why wouldn't the trial court have taken that into consideration? You know, I think the reason was, first of all, the point of snow that the interest payments are not reimbursable, frankly, I don't think was raised or considered by the trial court, but I think it's a clear enough principle based on the facts that it's not something that has to be disregarded because of waiver purposes or the waiver principle, et cetera, based on the facts of the case. And I think that alone, I mean, when the court is saying the non-marital party or the non-marital estate has to reimburse the marital estate for these loan payments based on snow, you can't order reimbursement of the interest payments, period. And I think that applies under Crook, which is an alternative argument. I think that, and that's the argument that you consider if there was substantial benefit to the marriage if the marriage was already compensated, and I think that's when you get into the question that the court is asking with regard to whether the land generated enough money to pay the mortgage payments and or, in fact, even more than that. But I think under snow, where $100,000 was effectively paid on the loan and the rest was interest, and the interest cannot be ordered as a reimbursement, and the $100,000 was effectively found by the court to have been reimbursed. I understand the general principle that you say that it stands for, but what is the theory behind that? And was there any citation in snow to back up the idea that interest can't be? To be honest with you, as I'm standing here now, Your Honor, I can't answer that question. Right. Okay. I can recall that the principle is very clearly stated, but I don't recall the particular rationale or whether there was other cases cited. Now, a somewhat similar but a little more complicated issue deals with the marital home, and there's actually three separate points in our argument, Parts 2, 3, and 4, that we've raised with regard to the court's treatment of the home. Mr. Baumann had maintained in the case that the marital home and the property in which it was located, in addition to the outbuildings from which the road repair business and the farming operations were all conducted, was his father's property. And in fact, I believe that ultimately not only did the wife end up conceding that, but the court so found that the property, in fact, belonged to the father, that it had been owned by the husband's mother and left to the father as trustee in a will. Although the will, which was submitted to the court early on when there was some fighting on temporary issues, also indicates that the remainder interest in the trust is to go to Mr. Baumann, that is, my client. The wife's position, as I understood it at trial, was that once it became clear the title of the property was in the father, was that the money that the parties had invested in refurbishing the home and the outbuildings some 8 to 11 years prior to trial was dissipation. The court did not find that to be dissipation, and I don't think could have, as there wasn't evidence of the marriage breaking down that far back. But what the court did do was rely on the case of In re Marriage of Didier and hold that the buildings, the home itself and the outbuildings, were personal property. It then valued the home and the outbuildings at, I forget the exact figure, but it was somewhere in the $650,000 range because that was the evidence that the wife brought as to how much they had spent remodeling and building the outbuildings and remodeling the home. And despite the fact that Mr. Baumann submitted a current appraisal from Mr. Klopfenstein indicating not on the outbuildings but on the house itself a value of, I believe, about $220,000, the court nevertheless valued the buildings themselves without the land at the $650,000 figure and awarded the buildings and the home as personal property to the marital personal property to the husband and then awarded a $300,000 home that the parties built by agreement during the divorce case for the wife to live in, paid for it out of marital funds and had it free and clear, awarded that to the wife and ordered Mr. Baumann to make up the difference in the values. Now, our first argument here is with regard to the treatment of the home and the buildings as personal property. The Didier case, which is a divorce case, did do that. It didn't cite any case. It cited an old, I believe it was a restatement or some old treatise. It cited no Illinois cases. I haven't found any Illinois cases that have cited it since. And our suggestion is that there are so many aspects to ownership of land and buildings in which buildings are automatically treated as part of the real estate. If you're talking about sales of property, if you're talking about foreclosures, liens, judgments, there's just no place that I can find where homes and buildings are generally treated as personal property as opposed to being part of the real estate to which they are attached. I also suggest that for the court to determine that the buildings on the father's property are personal property of the husband and his wife without the father being involved in the case for the purpose of making that determination and having the opportunity to be heard himself just can't be done. I mean, the ruling of the trial court obviously, as between the parties, isn't going to be binding on the father. So to say you've got $650,000 of personal property, husband, that you get is kind of a pig in a poke, as I think I said in the brief, that that's not binding on the father and the father still owns the property and I don't think anyone else is going to agree with the concept that the father owns the land and the husband owns the buildings. So I just don't think that could be done and I think realistically what should happen and could have happened in Didier too, and I'm still not sure why it didn't, is that the court here can look at the fact that the husband does have a non-marital interest, a residual interest or remainder interest in the property through the trust and through his mother's will. The court could say, okay, whatever interest the parties have in the property is a non-marital interest by inheritance and so the husband gets that. And then the court could move next to the question of reimbursement because of contributions made by the marriage, in this case through the remodeling and all that. Counsel, isn't that essentially what the trial court did do? No, I don't think so. Didn't the court take the $626,000 and then subtract the $300,000 that the wife got for her own house? Yes. And then he divided that by two and then that was the reimbursement, that amount. Yes. To me that's what the court did. However you want to classify it as non-marital and remainder or personal property, which I'm kind of with you, that seems odd, but there is an appellate court case that did that. It seems to me your argument really isn't that equation, it's simply the boundary. Well, and it is. And we've suggested first of all in our point three that for the court to value the property at the $625,000 or $650,000 figure was wrong, particularly where there's a current appraisal because the value of the property should be the non-marital or should be the fair market value of the property at the time of the divorce. And there was evidence as to that through the appraisal, but to go back and say But wouldn't the appraiser be a little bit suspect since they spent $400,000 on the new house? I think you could raise that question, but I also think that the, I mean I think if you look at the appraisal you can tell that it covers the house. I mean there was some suggestion that maybe it didn't cover all the parts. There's nothing in the appraisal if you look through it to indicate that it was anything less than a normal appraisal, full appraisal of the house and the immediate yard. It clearly did not cover the outbuildings, and there's no question that we're not suggesting that it did. So there's some additional value that has to be considered there. But to go back, I mean there's I'm sure many, many instances where people put money into a home that they're not going to get back out of it for one reason or another in any circumstance. And then you take into account the real estate recession that happened in 2008 several years after the, and that we're still feeling the effects of even now I think, very, very possible. And I think the Weiss failure to submit some type of a competing appraisal that would raise that question more clearly and say yes, if it could, say yes, we think this house is worth more than the other appraiser feels based on these factors, et cetera. I think that would have made some sense. But for the court just to go back and say, well, this money was put into it, and make that the value, I don't think that's right. Although I think you have to acknowledge that the court was consistent in taking the $600,000 as the amount of money invested in the improvements, did the same thing with the $300,000. There was no appraisal there, so the court, but that's treated them both the same. Well, the one difference there I would suggest, Your Honor, is that this was a, the $300,000 was spent a year before or so, before the divorce trial. So it's a much more, in fact, I don't think either party contested that that was a fair value for the house, which had just been built, including the property on which it was situated. So built or purchased, I don't remember if it was built. But in essence, that served as a similar function as a current appraisal, as compared to money that was spent eight, nine years ago, or in the case of the outbuildings, even more. And the final point on this, and point four of our argument, is another reimbursement issue under Crook. The fact is that other than this $600,000 spent on remodeling and building, the parties paid nothing for 29 years of living in this house, until the very, very end of the case when there was some rent charged to the husband. But aside from that, nothing paid. And based on the concept, I think the correct concept, that the farmland, including the house and the outbuildings, was the father's with the remainder interest to the husband, which was non-marital, to the extent you want to say, fine, that's his non-marital property, now you get to the question of reimbursement, the money that they paid, whether it was mortgage payments or whatever, but in this case it was the cost of the remodeling. Even if you take the entire amount, the 600 and some thousand dollars, over 29 years that works out to about $1,800 a month. And if you're paying that much for a place to live and a place to house your businesses and run your businesses out of, which generate all the money for the, virtually all the money for the parties to live on and raise their children for all these years and to build up the other assets, that seems pretty reasonable to me. I think the marriage was clearly compensated for any of that contribution, and I would suggest, I do suggest in here, that the proper result was for the farmland, or the homestead and the outbuildings, including the land to the extent the parties had any interest in it, to treat that as the husband's non-marital interest by inheritance, and then to consider whether or not there was reimbursement due, and if so, whether or not there was, to take that next step, whether or not the marriage had been fully compensated or substantially compensated under crook for the use, and I think clearly it has when you look at it from that standpoint, so that the husband keeps his non-marital stuff and the wife gets her house, and to the extent there needs to be some financial equalization there, fine, or not. I mean, I think the court, in its discretion, might have said you get the house and you just get to keep it because of other financial disparities that are viewed between the parties, and that might be the type of thing that this court, if this court looks at it and says, yes, we think that needs to be done, but we're not quite sure what the final result should be, it could be reversed and remanded to the trial court to take a further look at how that should work out and let the trial court apply its knowledge of the case, as well as the ability to hear further arguments from the parties on exactly how that should be done, but to do it the way the trial court did, I think, was just, and actually by relying on the Didier case, I believe, taking an approach that neither party had suggested and that was unnecessary and creates all these questions about ownership of the land, et cetera. So you'll have additional time for rebuttal. Okay, thank you, Your Honor. Thank you. Mr. Chief of Court, David M. Lynch representing the appellee Diana Brown. I guess all I'll start is responding to his first issues. First of all, in regard to the interest claim that he makes, the husband at no point in time ever placed in evidence how much interest was paid. He didn't indicate whether there was refinancings, whether there was additional land bought, whether that loan was even the original loan. The court had no information that there was the amount of interest that may or may not have been paid on this individual loan and how much was paid in principle. There was significant evidence that there was trading of land, that there was buying of land, that the interest was. Well, if there were $307,000 paid in 29 years and there was still $100,000 left in principle, it wouldn't be very difficult to calculate. There would be interest. I'm not saying there wasn't interest. I agree there was some interest. The problem is he also bought other land during those years as well. We don't know whether this is even the original loan that existed at the time that they're talking about. That's what I'm saying the problem is. He didn't basically delineate to the court. I bought it in this year. We never refinanced the property. In fact, he did acknowledge refinancing the property at least once during his testimony. This was a really unusual case. My client didn't have the money to hire a court reporter, which I would have loved to have done. All of the money was on the left-hand side without basically being paid until the end of the case. So there's gaps that I can't correct because we just didn't have incentive. I understand that. I'd ask Mr. Fleeting about the statement in the record that the land, non-marital land, actually generated enough income to pay that mortgage, which would include the interest. That was never proved to trial. There's no evidence of that ever being proved to trial. That's the first I'd ever heard that. Doesn't the bystander's report indicate that that's what his client testified to? Correct, without any evidence. But was it ever refuted is my question. My client did not have the documents, and the documents were never produced from many years ago. We couldn't get the documents. But was it ever contested? No, we couldn't contest it. That's correct. It was accurate. I acknowledge we did not contest it. You would also, I think, have to acknowledge that the farm ground generated some income. Absolutely. Clearly it generated income. They also had several other farms. He also sharecropped farms. He also cash-rented farms. So to point at this individual farm, we have no idea if that farm produced sufficient income. We know that his overall farming did. He also cash-rented farms. His father and he were very much, obviously, oriented together. So what would we make of the income that did produce it? There's never been proof it was adequate to pay it, or it wasn't adequate to pay it. So he gets no credit for it, then? He gets some credit. That's never been proven. I think if he wishes a credit, he'd have to prove how much the credit was. All he had was the total tax returns, showing the total farm income from all of the farming, the cash rent, the sharecropping, the land they owned, the land my client's dad owned. They also sharecropped my client's father's land. We had the total amount paid. We had the total interest paid. At no point was it ever delineated or broken out how much went to each one. That's the problem I think the court had. So the court couldn't get some credit. Basically your argument, then, because that wasn't broken out, he gets no credit for anything. I think if he wants credit, you have to prove it, don't you? That would be a position I'd take if I was a judge. Let me ask you this thing. In reading the trial court's order, the only reference that I can find to the income that the non-marital land generated was its reference to the real estate taxes. That's correct. Basically the trial court, without specifying what the real estate tax bill was, said that there had to be some income so therefore there's no reimbursement of real estate. That was the only proof that we did have because that was broken into. It actually had the bills at one point, and we actually stipulated to the amount of the tax return. I just said that because the trial court's order says it's unknown. At least that's the way I read it. But your brief says it was $99,000. That's about right. That was pretty close to being correct, yeah. Okay, so am I reading the trial court order correctly then that the court did give him some credit for the farm? We stipulated. That would be in the amount of the $99,000 in real estate. Right, and we stipulated to the real estate taxes, yeah. Okay. In regard to the house, it is an unusual issue. There's no question about it. First of all, you have to remember the less than a month before he filed for divorce, this husband, in exhibit number 32, filed an affidavit for a loan listing the property owned by the parties, the real estate that we're talking here, the home and the outbuildings, as property owned by he and his wife. It's exhibit 32. My client had no knowledge the house was not in joint name and belonged to both parties until sometime after the divorce when his father filed a motion to kick her out of her own home. That was the first notice she ever had that this home, this house was not owned by both of them. At that point in time, we then found out that the father, who's not the owner of the land, the father, as they contend, is not the owner of the land. He's the trustee of the trust that owns the land. When the mother of my client, Mr. Ronald Baumann, when his mom died, she transferred her real estate into a trust with her husband as the trustee, with Ronald as the sole beneficiary. Not Ronald's brother, who's a handicapped young man, but Ron basically is the sole beneficiary of the trust. It is, however, management, and the father receives the income from it if there is any income, et cetera. But he doesn't own the property. The first knowledge we even had that this land had anything to do other than with two parties was that after the foreclosure action was filed, excuse me, the ejection action was filed against her by the trustee, which would be my client's dad, we asked the court for equitable interest in the property. The property and the husband testified that the marriage began to break down in 2007. That was his own testimony at page 834 of the record. In 2007 forward, the most grotesque fraud I've ever seen in the 40 years I've practiced law preceded. I have never in my life, and I've dealt with over 8,000 divorces, seen something similar to this case. The business was destroyed, and at the exhibit that we also put in was the summary of what the husband wrote he was going to do, which the court found to be very interesting. It was filed line for line, destroyed, sell the business, destroyed the property, expensive ejection from the property of the wife. All of this began basically a month before the divorce. The business, which made $1,000,000, $900,000, excuse me, profit individually for the husband two years before, within a year of the divorce starting was bankrupt. The money was transferred from the property, and had the trial judge not granted my motion to subpoena the records of the father, we would never have been able to prove it. The trial court went through every tax return, every check, every deposit left by the father to determine whether it was relevant. He then allowed me use to it, and we suddenly found all of the money transferred out of the business into third parties' names and then into the father's names. We cite it, and the judge cites it all the way through the case. This man basically intentionally defrauded my client, or attempted to do so, and thank God the court found out. But when it comes down to the house, etc., they took over $600,000 when my client thought it was in joint name. She would never have obviously agreed to a loan to give money to her father, his father, the $600,000 the parties spent on their life, to build this house, those outbuildings. By the way, these outbuildings are magnificent. I've been there many times. These are magnificent outbuildings which are presently being used, by mere happenstance, by the company that took over from the company that my client bankrupted. The person who owns that company now is his best friend and the guy who ran the company directly underneath it. That's also one of the things the court found happened here. It is inequitable in any way not to reimburse my client for the expenditure of these funds. And Didier is clearly grounds to do that. There's been no reversal of that order. No court has found it to be incorrect. And you're not going to see a lot of cases like this. In my 40 years of doing this, I've had two cases, this one and one other one, when somebody inadvertently built it on their father's land when they thought they were building it a lot over. That was clearly found to be a marital property and the person had to pay it back, but that was not an intentional act. This was clearly intentional. The husband himself acknowledged that he had told her it was marital, it was owned by them. By filing with the bank a month before the divorce, it was property owned by he and his wife. For him to come in today and try and say that he's being maltreated in any respect, when he has attempted, when he's destroyed the family business, and I don't even know if the court wants me to argue the other points that were brought up, but I did file with the court in May of remarriage of ICQBAL. I'm not sure I'm pronouncing that correctly. I'd like to hear arguments as to why the value the court placed on the divorce and the out. I think the court was... Just taking the amount that was spent, and counsel said some eight or nine years prior to that. That's correct. And the depreciation. The last part was billed in 93. So I think that it would have been, excuse me, 2003. So it was about six years before the marriage fell apart. It was the last expenditure. $179,000 I think it was for the buildings. First of all, if you look at the appraisal done by their expert, the appraisal one never acknowledged what area it was even appraising. It said it got the information as to what area to appraise from his attorney, Mr. Hasselberg, and from my client and from Mr. Bowen himself. He never delineated how much of the acreage was involved in the appraisal of that house. Two, he never at any point considered the larger portion of that land that involves the house and the sheds and completely left that out. That includes the land itself. It includes the sheds, and there's four sheds there that are built. He also indicated that he took all of the documents and everything, that all of his assumptions came from Mr. Bowen. I concede, and I think it would be... Well, my question actually went, I thought, at least, to just accepting the amount of money put into the outlays in the new house some eight years earlier. Why was that an appropriate valuation? I think because the appraisal itself was not reliable. The appraisal was very suspect, but why is that an appraisal? Well, my question, we didn't have any money at all to get an appraisal, so the court felt the appraisal was suspect and felt the only way to adequately do it was to say the $600,000 of marital funds taken and used for his sole benefit would be equivalent to the $300,000 which, by agreement, was voluntarily paid by his attorney himself, by court order, to her so she could build at least a house, which is less than half of what she had. So you're basically saying there wasn't enough information... Yeah, I think the court did what it had to do. It took the amount in here, took the amount here, and said it's fair to equalize the two. And each of them, in effect, get a 50-50 division of the property. I think that's what they did, and I think it's what they amended to do. As to the prenuptial... Well, in the reading from the 58-page court order, I think, if I read it carefully, but maybe you can clear the sub for me, once the court made all its determinations on what was marital and what was not marital, was there an even division in the marital property? Oh, yeah. It took me hours to figure that out, to be very blunt. I've had a lot of judgments, but 56 pagements is a record for me. I've never had a 56-page judgment. It took me hours. My secretaries went through it. Well, whatever it was, I've read shorter books. But it was interesting. I think the judge understood completely what was going on in the case. I think his findings of his lies, his misrepresentations, his transfers of money underneath to various people and back to his dad, it's all clear what happened here. It's just nice that once in a while a good guy wins. I know that's a little bit on my side, but my client was never found guilty of anything in the way of dissipation, of any wastage. Before you sit down, Mr. Fleming never got into the maintenance? Yeah. So I'm going to ask you a question, that way he'll have a chance to respond and won't be bringing up a new subject. Why is $5,700 the appropriate amount? The court basically took his last... Sure. This court took, first of all, it's almost a 30-year marriage, 29 years. Her primary employment in her entire life was being a teller at a bank, which she still is. She's now back as being a teller at the bank. It's the only skill she has. She has no other education. She has no... She spent her entire 32 years raising... But she's got the 33 acres that she... She does have the 33 acres. Then she has that 25% interest in the trust. That's correct. How much does that generate? Because I can't tell from the court order. The 25% interest has not paid her a penny since the end of the divorce. That I do know because I've seen the tax returns. Not a penny. Okay. Eventually she'll get something. I didn't find that in the orders because it's not there. It hadn't generated any money the three years before, and it still hasn't generated any since. How about the 33 acres that she got? I don't know what she generated this year. This was the first year she had property. How much marital property did she receive? She's got almost nothing yet due to his bankruptcy after the divorce, which now he's waived his objection. He's being sued in bankruptcy court by various trustees, so his discharge has been withdrawn. Okay, so they split the marital property. She got nothing? It's all being held in the bankruptcy trust right now. How much is it? It's over $450,000 being held by the bankruptcy court at the present time. To which she's entitled to half? She's entitled to a majority of that. I think there's only about four claimants against it right now. Could you better tell me what a majority would be? The last I talked to the bankruptcy trustee, which would have been several months ago, they thought she would get about $400,000 to $450,000. But none of this is in the record? Yes, none of it will be paid to her until the bankruptcy is completed and all the lawsuits are done, and they're pending all over the place in the bankruptcy court. I don't want to probe into any more. I wouldn't have brought it up if you hadn't asked. Okay, thank you. As to the claim that she has signed a postnuptial agreement, I think the most recent case which I filed by, which was published after my opinion, which is the Ichabod and Kahn case, I think solves that issue. It's the same basic rule as it is for post-prenuptial agreements. This clearly was no disclosure of assets. She was a representative of counsel. She doesn't even remember signing it. And even he says she just signed it and threw it at him and said, fine. So I don't think there's any real issue there that exists anymore because of that. That's all I have, Mr. Court. Any further questions? There don't appear to be any. Thank you. Thank you, Your Honors. With respect to the first issue about the farm mortgage payments, I think the court's findings on this resolve any questions that the court was asking. The court found that there was a loan, a $200,000 loan, that payments were made $13,000 plus a year, one annual payment per year, which resulted in the total payment of $378,500, $250, and that the loan balance was just over $100,000 at the time of trial. The court made those findings and fairly extensively reviewed what happened with the different parcels of real estate. So I don't think there's any question that there was, round figures, $278,000 in interest paid and $100,000 in principal reduction. There weren't any other purchases of property. There's no evidence of that. The court made substantial findings as to what was purchased and traded back and forth. The stipulation of real estate taxes paid over the years was $99,000. No, I don't believe so at all. The $99,000 was when some of the land was sold. It was sold for $163,000, I think, $164,000. Some of that was reinvested in another piece of property, which was then subjected to the existing mortgage loan. But the other $99,000 was just put back into it. Right, I understand that, but opposing counsel's brief said that just by happenstance, I guess, there was another $99,000 figure, and that was the amount of real estate taxes that were paid over the years, and your client didn't have to reimburse the marital estate for those. Do you disagree with that? To be honest, I don't recall that being in the record. Okay. Do you want to comment on maintenance before you go on? Yeah, and with respect to maintenance, Your Honors, the point we've made in our brief, I think, is just that the court kind of funnily said, well, $5,700 because that's what we were doing at the beginning of the case. I don't think it, when you look at the relative lack of evidence of the true wife's needs, the fact that the court did find that her basic income covered her basic needs, the fact that by the time we went to trial, my client was earning $3,000 a month working for his dad, had lost his business that generated the road repair business that generated the bulk of the family income, had previously, by an agreed order, sold his interest in the farm equipment that he owned with his father, and essentially gave up the farming business, doing it himself, so that he could put some money into the road repair business, which ultimately didn't do the trick. I mean, he's sitting there with relatively little ability to earn money, at least at that point. Yes, he had a track record of earning a lot of money when he was running his own business, when he was doing the farming, but that wasn't the situation anymore, and hadn't been for a while by the time of trial. And for the court, just to willy-nilly say, okay, you can afford to pay $5,700 without taking into account the usual factors, and particularly without somewhat more detail as to reasonable living expenses on the part of the wife, I just think that was kind of a knee-jerk reaction. I think counsel was able to paint a pretty dastardly picture of Mr. Baumann through the trial, and Mr. Baumann, of course, made the very silly and stupid mistake of firing his attorney just a couple of months before the trial, and went in through this trial pro se. And that worked against him very clearly, but I think the court got sufficiently carried up in everything that it just started throwing out numbers and throwing out money that really didn't make sense under the circumstances. By the way, with respect to the ownership of the house, I don't believe there was evidence that my client ever represented specifically to anyone that his wife had an ownership interest in the house. I do believe there was a financial document where he listed the house as an asset, but not specifically that her name was on the title. And the court specifically found that he had told her that he had inherited the home from his mom when she passed away. There was no finding by the court or even mentioned by the court of any representation by my client that would have made her think that she had an ownership interest. So it was strictly the question as to whether the house was in the father's name or the trust name, or whether, in fact, the husband owned it outright as an inheritance from his mother. That was the uncertainty. And I agree that there may have been some misunderstanding of the wife because of what the husband said, but never that she had an actual ownership interest in the house. Thank you. Thank you, Mr. Chairman. Thank you, Your Honor. We will stand in recess until verdict is the next case.